1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10   CUBIC TELECOM LIMITED,                    Case No.  14-cv-02956-EDL

            Plaintiff,
11
                                              **ORDER DENYING MOTION FOR**
12      v.                                    **SUMMARY JUDGMENT**

13   CHENGBEN WANG,

14            Defendant.

15   **I.      INTRODUCTION**

16          This is a breach of contract case brought by Plaintiff Cubic Telecom Limited ("Cubic"), as

17   the holder of a $500,000 Promissory Note originally executed by Defendant Chengben "Peter"

18   Wang ("Mr. Wang") in favor of Peregrine Network, Inc. ("Peregrine") but subsequently assigned

19   to Cubic.  Plaintiff moves for summary judgment on the basis that it is undisputed that Mr. Wang

20   agreed to pay $500,000 plus interest and failed to pay this amount so breach of contract has been

21   established.  Mr. Wang counters that Cubic has not established that it is the holder of the Note, and

22   that there are triable issues of fact as to whether Mr. Wang was fraudulently induced to sign the

23   Note to defeat summary judgment.  Cubic responds that the parol evidence rule bars extrinsic

24   evidence related to an integrated contract, Mr. Wang is legally precluded from arguing fraudulent

25   inducement where he had time to review the agreement and was represented by counsel before

26   signing, and even if the Court could consider evidence of fraudulent inducement, there is

27   insufficient evidence to support Mr. Wang's theory of fraudulent inducement.

28          The Court held a hearing on the matter on August 4, 2015, during which it requested

United States District Court
Northern District of California

additional briefing from the parties.  Having considered all of the briefs and evidence as well as the arguments presented during the hearing, the Court is unpersuaded by most of Mr. Wang's arguments.  However, while a close question, viewing the evidence in the light most favorable to the non-moving party as the Court must, there is a triable issue of fact as to whether Mr. Wang was fraudulently induced to sign the Note based on a statement Peregrine made about the status of its investor funding commitments.  Though Mr. Wang's limited circumstantial evidence consists primarily of equivocal statements and may not be enough to convince a jury, it possible that Mr. Wang could establish a fraudulent inducement defense.  Cubic's motion for summary judgment is therefore DENIED.

## II.    FACTUAL BACKGROUND

Mr. Wang is a retired businessman who is fluent in English but sometimes has difficulty overcoming language and cultural barriers arising between himself and native English speakers. Declaration of Chengben Wang ("Wang Decl.") ¶¶ 2-3.  His business primarily focused on real estate development, and prior to the dealings that gave rise to this case he had no experience buying stock in start-up companies, the details of investing in high-tech companies, or how such companies obtain financing.  Id.  Peregrine was a corporation that sought to sell mobile broadband services to laptop and tablet users.  Declaration of Mark Peterson ("Peterson Decl.") ¶ 3, Ex. 3.

In March 2011, Peregrine issued an "Investor Update" that stated: "Unless the Company receive [sic] emergency funding by tomorrow . . . the Company will cease operations at close of business Friday . . . due to insolvency."  Id. ¶ 3, Ex. 1 (Cubic001440).  Peregrine notified investors that it had "aggressively" searched for a bank loan but had "been rejected as not meeting current commercial lending requirements." Id. (Cubic001443).  However, Qualcomm Inc. offered to make a $3 million loan if Peregrine' business was "fully funded."  Id. at Ex. 2 (Cubic001447).

On September 26, 2011, Peregrine issued an Investor Update notifying investors that it was finalizing terms to secure the loan from Qualcomm conditioned on Peregrine's ability to "have sufficient funds to operate for longer than a few weeks."  Id. ¶ 3, Ex. 4 (Cubic000983).  As Peregrine explained it at that time, investors would need to raise an additional $375,000 before Peregrine could close an initial $1 million loan transaction with Qualcomm, and by October 15,

investors would need to fund another $555,000 for Qualcomm to release another $870,000.  Id.

Three days later, on September 29, 2011, Mr. Wang met Peregrine's Chairman John Hendrick.  See Wang Decl. ¶ 5, Ex. 1 (PW000028); Petersen Decl. ¶ 6, Ex. 9 ("Wang Depo.") at 13-14.  Mr. Hendrick was also President and Chief Executive Officer of a medical-device manufacturing company called NeoVista, Inc. ("NeoVista").  Mr. Hendrick encouraged Mr. Wang to invest in Peregrine, and told Mr. Wang that he would get "good value of a share, good deal" and "a lot of business exposure to other people in the South Bay."  Wang Depo. at 16-17.  Mr. Wang believed that Peregrine had a contract with HP and was "a long-time established company."  Id. at 20-22.  The next day, Mr. Wang offered to invest $1 million in the company.  Wang Decl. ¶ 12, Ex. 1 (PW000028).  According to Mr. Wang, this offer was intended to be in exchange for shares of Peregrine and the right to produce and market both Peregrine and NeoVista's products in China.  Id.  After Mr. Wang received draft agreements from Peregrine for review on October 3, 2011, he forwarded them to his attorney with a note stating that, "As part of the agreement, John Hendrick will let me have rights to manufacture and market NeoVista product, in China."  Id. (PW000023).  Mr. Hendrick consistently used a "neovistainc.com" email address, and in an email seeking to finalize the Peregrine investment, Mr. Hendrick signed the email as President and CEO of NeoVista.  Wang Decl. Ex. 3 (PW000982).  Mr. Wang claims that he believed that Peregrine and NeoVista were one and the same, and that his willingness to invest was based on his understanding that he was going to get an agreement to produce and sell the Peregrine and NeoVista products and services in China. Wang Depo. at 16, 18-19, 24-25, 27-28, 35, 41, 61-62, 81-82, 84-86, 112-13; Wang Decl. ¶ 12, Ex. 1 (PW000023, 28).

However, Mr. Hendrick, writing from a NeoVista email address, explained to Mr. Wang: "I want to make sure you know that we [Peregrine] do not have a material product."  Id. (PW000027).   In the same correspondence, Mr. Hendrick stated, "In regards to manufacturing in China for NeoVista. That is a separate agreement from Peregrine.  As I would like to get into the market in China as soon as possible, you building and manufacturing our product is highly doable. I have committed to help you set up the operations in China. I will do this free of charge."  Id.  In response, Mr. Wang stated he realized that "to buy 10% of Peregrine is only $950k, but I'm

United States District Court
Northern District of California

willing to pay you more for the consideration of marketing the software system in China, under Peregrine's license agreement." Id.  Mr. Wang then discussed manufacturing and marketing NeoVista's product in a separate paragraph. Id.  In later correspondence, Mr. Hendrick sought to discuss with Mr. Wang the detailed costs of doing NeoVista business in China at a later date. Id. (PW000025).  Emails reflect that Mr. Wang was advised that Peregrine believed that "the China deal is a separate deal with Neovista." Id. (PW000021); see also PW000027 (Mr. Wang was specifically informed that any agreement regarding NeoVista is "a separate arrangement from Peregrine" and that Peregrine did not manufacture products to sell in China).

During the negotiation of the Peregrine investment and stock purchase, Mr. Wang was represented by counsel.  Wang Depo. Exs. 6-9.  On October 4, 2011, Mr. Wang received comments on the Peregrine deal from his attorney and forwarded them on to Mr. Hendrick.  Wang Decl. Ex. 1 (PW000020).  In this email chain, in response to a comment from Mr. Wang's attorney about the Qualcomm loan, Peregrine stated:

> No, Qualcomm hasn't yet loaned any money to Peregrine.  The first loan from Qualcomm will be drawn down at Closing in the next couple of days.   After that, Qualcomm will loan another $1M in two steps in October and November when Peregrine investors commit another $2.1M in equity.  During 2012 Qualcomm may, but does not have to, loan another $1M if the business needs it.

Id. at PW000021.  Later in the same email chain, in response to a question from Mr. Wang's counsel about the requirement that Mr. Wang pledge his Peregrine shares to Qualcomm, Peregrine stated:

> Peregrine obviously does not want Qualcomm to take the shares of any investor. Peregrine plans on getting a bank loan to replace all or part of the Qualcomm loan, in which case Qualcomm would be asked to convert its loan to stock. Peregrine investors have also committed to funding or obtaining the remainder of the equity requirements so that Qualcomm will not have a reason to seize the stock.  Once Closing occurs, Peregrine will have a clean balance sheet and during October will have over $80,000 in revenue from HP and other customers. Therefore, the company will be likely to obtain bank financing.

Id.  Mr. Wang's attorney responded to this paragraph, "This is far from certain Peter." Id.

On October 6, 2011, Peregrine and Qualcomm amended the terms of the Qualcomm loan, and Peregrine was required to obtain $500,000 by October 15, 2011 and $1.7 million by November 30, 2011.  Peterson Decl. ¶ 3, Ex 6 (Cubic000960).  The following day, Mr. Hendrick

1   told Mr. Wang that they would need to complete their deal "by Monday" and arranged a dinner at

2   which Mr. Wang would sign a Promissory Note.  Wang Decl. ¶ 13, Ex. 2 (PW00697).

3          On October 9, 2011, Peregrine issued an Investor Update notifying investors that it had

4   closed on the Qualcomm agreement and obtained $1 million from Qualcomm based on investors

5   providing $1.4 million in new funds.  Peterson Decl. Ex. 5 (CUBIC000977).  The update also

6   stated that Peregrine needed to fund an additional $500,000 by October 15 to maintain ownership

7   under the Qualcomm contract, and that it had commitments of about $75,000 of the $500,000

8   needed.  Id.  Further, the update stated that Peregrine would need to raise an additional $1.2

9   million by November 30 for Qualcomm to fund an additional $200,000.  Id.; see also Ex. 6

10  (10/12/11 Investor Update) (CUBIC000960) ("if we raise this $500k by this Friday, in order to

11  complete the full $2.5 M we still need to raise an additional $1.7M by November 30th, and at that

12  point Qualcomm will fund an additional $200K. The Board strongly believes that as soon as

13  investors fund this $500k (plus draw down another $800k from QC) that the Company is credit-

14  worthy and will be in a strong position to obtain bank loans at that time.").

15         During the negotiation period, Mr. Hendrick and Peregrine did not provide Mr. Wang with

16  any Investor Updates, did not tell him that banks had refused to loan Peregrine money, and did not

17  explain the details of the Qualcomm financing arrangement which ultimately required him to

18  pledge his Peregrine shares to Qualcomm.  Wang Decl. ¶ 21, 23-25; Wang Depo. at 20-22, 30.

19  However, Mr. Wang was specifically advised by his own attorney that he would have to honor his

20  obligations under the Note "regardless of how well the company does after you sign."  Wang Decl.

21  Ex. 1 (PW000021).

22         Mr. Wang, Mr. Hendrick and Peregrine's attorney Mr. Foster met at a restaurant on

23  October 11, 2011 and Mr. Wang executed a Promissory Note (the "Note") in favor of Peregrine

24  and its "permitted assigns, transferees, and successors" in the principal amount of $500,000.

25  Wang Depo. at 4, Ex. 1; Compl. ¶ 5, Ex. A.  The Note was executed in connection with Mr.

26  Wang's purchase of stock in Peregrine.  Wang Depo. at 50, Ex. 3 (Peregrine Network, Inc. Series

27  A Stock Purchase Agreement).  Mr. Wang's shares were then pledged to Qualcomm.  Wang Depo.

28  Ex. 2 (Pledge Agreement).  Mr. Wang claims that he had trouble reading the Note he signed

United States District Court
Northern District of California

during dinner because he forgot his glasses, but he signed anyway.  Wang Depo. at 29.

In December 2011, Mr. Wang spoke to people in China about the Peregrine and NeoVista products and reported back to Mr. Hendrick.  Wang Decl. ¶¶ 15-17, Ex. 4 (PW001315, PW001335-36); Wang Depo. at 18-19.  Mr. Hendrick responded, "[G]ood to hear from you. Make sure you stay warm. Give me a call when you can." and never spoke to Mr. Wang about the Chinese market for NeoVista or Peregrine products again.  Wang Decl. ¶ 17, Ex. 5.  After securing a loan from Mr. Wang, Peregrine unsuccessfully tried to obtain additional investors.  Wang Decl. ¶ 20, Ex 7 (PW001364-66).

It is undisputed that Mr. Wang failed to make payment on the Note upon the maturity date of December 31, 2011.  O'Sullivan Decl. ¶ 6; Wang Depo. at 132, Ex. 12 (PW00986) (January 2012 Letter from Peregrine to Wang).  Under the terms of the Note, interest accrued on the principal amount of $500,000 at 2% per annum until default when the interest shifted to 1% per month.  Compl. ¶ 6, Ex. A.  Cubic purchased Peregrine's assets as set forth in the Amended and Restated Foreclosure Sale Agreement, dated April 19, 2012, entered into between Cubic and Qualcomm.  O'Sullivan Decl. ¶ 4 and Ex. 3 thereto ("Foreclosure Sale Agreement").  On or about April 19, 2012, the Peregrine Assets, including the Note, were sold, transferred and assigned from Qualcomm to Cubic as set forth in the Amended and Restated Bill of Sale.  O'Sullivan Decl. ¶ 5 and Ex. 4 thereto ("Bill of Sale").

**Evidentiary Objections**

Cubic claims that it is the holder of the Note, legally entitled to payment of all amounts due and owing from Mr. Wang, based on the declaration of Fiona O'Sullivan and the attached exhibits.  Mr. Wang objects to the entire declaration of Fiona O'Sullivan and its exhibits.  He argues that Ms. O'Sullivan's assertion that she is the Legal and Compliance Officer at Cubic Telecom Limited, without elaboration as to her responsibilities or the length of time she has held the position, is insufficient to show her personal knowledge of the facts stated in her declaration.  Under Rule 56(e), a declaration not based on personal knowledge is inadmissible at the summary judgment stage.  See Fed. R. Civ. Proc. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall

United States District Court
Northern District of California

1    show affirmatively that the affiant is competent to testify to the matters stated therein").  Mr.

2    Wang also argues that Ms. O'Sullivan's declaration does not lay the foundation to authenticate the

3    attached documents so these documents cannot be considered on summary judgment.  See Beyene

4    v. Coleman Sec. Services, Inc., 854 F.2d 1179, 1182 (9th Cir. 1988).  The challenged documents

5    include the Notice of Disposition by Private Sale, a UCC Financing Statement, an Amended and

6    Restated Foreclosure Sale Agreement, an Amended and Restated Bill of Sale, and a Stock

7    Certificate No. 29.  The Court agrees with Mr. Wang that Ms. O'Sullivan's original declaration

8    did not establish any personal knowledge of the transaction between Peregrine and Qualcomm, or

9    otherwise show how she is qualified to testify about the transaction between Peregrine and

10   Qualcomm or to authenticate documents relating to that transaction when she is a Cubic employee.

11   Therefore, the objection is sustained as to paragraphs 2, 3 and 8 of the original O'Sullivan

12   Declaration as well as Exhibits 1 and 2.

13       However, the inadmissible information and documents relating to the underlying

14   transaction between Peregrine and Qualcomm are irrelevant to the motion for summary judgment,

15   as the pertinent issue currently before this Court is whether Cubic is the current holder of the Note

16   entitled to enforce it.  See 6 Del. Code § 3-308(b) ("If the validity of signatures is admitted or

17   proved and there is compliance with subsection (a), a plaintiff producing the instrument is entitled

18   to payment if the plaintiff proves entitlement to enforce the instrument under Section 3-301, unless

19   the defendant proves a defense or claim in recoupment. . . .").  Under 6 Del. Code § 3-301, a

20   "'[p]erson entitled to enforce' an instrument means (i) the holder of the instrument, (ii) a

21   nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in

22   possession of the instrument who is entitled to enforce the instrument pursuant to Section 3-309 or

23   3-418(d).  A person may be a person entitled to enforce the instrument even though the person is

24   not the owner of the instrument or is in wrongful possession of the instrument."

25       In response to Mr. Wang's objection to evidence, Cubic submitted a "Supplemental

26   Declaration of Fiona O'Sullivan" establishing that it is the present holder of the Note.  This

27   declaration states that as the Legal and Compliance Officer at Cubic, Ms. O'Sullivan was

28   "personally involved in the negotiation and purchase of" Peregrine's assets from Qualcomm which

resulted in the Amended and Restated Foreclosure Sale Agreement attached as Exhibit 3. Supplemental O'Sullivan Decl. ¶ 2. She further states that she has personal knowledge of the Restated Bill of Sale attached as Exhibit 4. Id. ¶ 3. She states that she is familiar with the facts and circumstances described in both declarations and Exhibits 3 and 4 due to her personal involvement with Cubic's negotiation and purchase of Peregrine's assets from Qualcomm. Id. ¶ 4.

Mr. Wang also objected to the Supplemental Declaration, arguing that Ms. O'Sullivan's statement that she was personally involved in the negotiation and purchase of assets from Qualcomm constitutes new evidence in a Reply and still does not lay sufficient foundation for the underlying documents that Cubic seeks to introduce. Generally, new evidence or issues raised for the first time on Reply should not be considered. See Kaufman v. City of San Francisco, No. 08-03755 EDL, 2009 WL 5184468, at *1 (N.D. Cal. Dec. 22, 2009) (quoting Am. Traffic Solutions, Inc. v. Redflex Traffic Sys., Inc., 2009 WL 775104, at *1 (D. Ariz. March 20, 2009) ("The remedy for dealing with new evidence first appearing in a reply is that we will not consider issues or evidence raised for the first time in plaintiff's reply."). However, no new exhibits were submitted and Ms. O'Sullivan's explanatory statement about her personal involvement in the transaction to cure deficiencies raised in Mr. Wang's objections to her first declaration, does not constitute new evidence.

Mr. Wang also argues that even if the supplemental declaration is considered, it is insufficient because Ms. O'Sullivan simply claims that in her position as Legal and Compliance Officer for Cubic, she was personally involved in the negotiation and purchase of assets from Qualcomm and therefore has personal knowledge of the Amended and Restated Foreclosure Sale Agreement and Restated Bill of Sale attached as Exhibits 3 and 4 to her original declaration. According to Mr. Wang, she should have further explained her duties as Legal and Compliance Officer and whether she was involved in drafting or executing the documents in order to properly authenticate the documents. However, "personal knowledge can be inferred from a declarant's position within a company or business." Edwards v. Toys "R" Us, 527 F. Supp. 2d 1197, 1201 (C.D. Cal. 2007) (citing In re Kaypro, 218 F.3d 1070, 1075 (9th Cir.2000) ("Personal knowledge may be inferred from a declarant's position"); Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999,

1018 (9th Cir. 1990) (concluding that CEO's personal knowledge of various corporate activities could be presumed). Given her position within Cubic, Ms. O'Sullivan has cured the deficiencies of her original declaration with respect to her personal knowledge of the Qualcomm/Cubic transaction and associated Exhibits 3 and 4, and the objection is overruled as to this evidence.

**Legal Standard**

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

9

1   Enforceability and breach of contract are questions of law, as is whether a contract is fully

2   integrated.  See, e.g., Knight v. Aqui, 966 F. Supp. 2d 989, 1000 (N.D. Cal. 2013); Moore Const.

3   Co. v. Quanta Specialty Lines Ins. Co., 2009 WL 1759691, at *9 (E.D. Cal. June 22, 2009).

4   **III.     DISCUSSION**

5        **A.     Cubic's Right to Enforce the Note**

6        Mr. Wang argues that Cubic has failed to establish its right to enforce the Note through a

7   valid transfer or assignment because it has not submitted admissible evidence tracing the Note

8   from Peregrine to Qualcomm to Cubic.  As discussed in connection with Mr. Wang's objections to

9   evidence, Ms. O'Sullivan's declaration, supplemented by her Supplemental Declaration attesting

10  to her personal knowledge of the Qualcomm/Cubic transaction, is sufficient to authenticate

11  Exhibits 3 and 4 and establish that Cubic is the current holder of the Note with enforcement rights.

12       **B.     Breach of Contract**

13       The parties agree that Delaware law applies.  Under Delaware law, the elements of a claim

14  for breach of contract are: (1) the existence of a contract; (2) the breach of an obligation under that

15  contract; and (3) damage to the plaintiff.  See VLIW Tech., LLC v. Hewlett-Packard Co., 840

16  A.2d 606, 612 (Del. 2003).  Cubic argues that there is no triable issue of fact as to any of these

17  elements so summary judgment in its favor is appropriate.

18       Mr. Wang does not dispute that he signed the Note promising to pay $500,000 plus interest

19  by December 31, 2011.  See Answer p. 2 ("Wang admits that on or about October 11, 2011 he

20  signed a document similar to that attached to the Complaint as Exhibit A."); see also Wang Depo.

21  pp. 46–50, 57 (Mr. Wang signed the Note as part of a deal in which he purchased Peregrine stock).

22  Pursuant to the Note, Mr. Wang "unconditionally promises to pay to Peregrine [] on December 31,

23  2011 . . . the aggregate sum of Five Hundred Thousand Dollars ($500,000)" plus interest. Wang

24  Depo. Ex. 1.  There is no dispute that Mr. Wang failed to pay on the Note.  Wang Depo. at 132,

25  134, Ex. 12 (January 2012 Letter from Peregrine to Wang).  There is also no dispute that Cubic

26  has been damaged by Mr. Wang's failure to pay on the Note because it purchased Peregrine's

27  assets from Qualcomm, including the Note.  O'Sullivan Decl. ¶ 7.  Thus, the elements for breach

28  of contract are met.  However, Mr. Wang argues that his non-performance was excused because he

United States District Court
Northern District of California

was fraudulently induced to sign the contract based on misrepresentations and omissions about the terms of the agreement as well as Peregrine's financial condition.

###        C.        The Parol Evidence Rule

Cubic argues that the parol evidence rule applies to bar extrinsic evidence of any oral understanding that varies the terms of the written agreement.  "When a written contract is intended to be the final expression of the parties' agreement, the parol evidence rule bars the introduction of evidence of prior or contemporaneous oral understandings that vary the written terms of the agreement."  Carrow v. Arnold, 2006 WL 3289582, at *4 (Del. Ch. Oct. 31, 2006), aff'd, 933 A.2d 1249 (Del. 2007).  "When determining whether a written contract is the final expression of the parties' agreement, a court should consider the facts and circumstances surrounding the execution of the instrument. Some of the factors a court should consider are: the intent of the parties, where such intent is discernible; the language of the contract itself and whether it contains an integration clause; whether the instrument was carefully and formally drafted; the amount of time the parties had to consider the terms of the contract; whether the parties bargained over specific terms; and whether the contract addresses questions that naturally arise out of the subject matter."  Id. (finding that the parol evidence rule applied where a contract was typed, the parties had a week to consider it before execution, and it addressed questions that might logically arise given the subject matter even though the written agreement did not contain an integration clause).  Under Delaware law, the presence of an integration clause, specifying that the contract represents the final expression of the parties, creates a presumption that the contract is integrated.  See id. at *5.

Though the Note itself does not contain an integration clause, the related Stock Purchase Agreement specifically contemplates the Note and contains an integration clause.  See Wang Depo. Ex. 3 at 5; see also Dubuque v. Taylor, 2007 WL 3106451, at *2 (Del. Super. Oct. 1, 2007) (refusing to consider parol evidence that would alter the terms of a purchase transaction in part because one of the related agreements contained an integration clause).  Further, the Note and related agreements are typed, formal documents, there is evidence that the deal was negotiated over approximately two weeks with input and advice of counsel, and the Note addresses subjects likely to arise given the subject matter.  See generally Wang Depo. Exs. 1, 9-10.  However, despite

11

the foregoing indicia of a fully integrated contract that would otherwise preclude consideration of parol evidence, Mr. Wang claims that he was fraudulently induced to enter into the agreement.

### D.   Fraudulent Misrepresentation

There is an exception to the parol evidence rule where fraud or misrepresentation is alleged, and extrinsic evidence of such representations made prior to the written agreement will be admitted.  Carrow, 2006 WL 3289582 at *8.  Under Delaware law, a claim for fraud requires: "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance."  Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).  Significantly, fraud is not limited to overt misrepresentations, but "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.  Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading."  Id.  Mr. Wang argues that he was fraudulently induced to sign the Note and it is therefore unenforceable.

#### 1.   Prior Oral Promises Regarding Future License Deal In China

Cubic counters that fraudulent inducement is legally unavailable as a defense to Mr. Wang because he had an opportunity to read the contract, and in doing so could have discovered any alleged misrepresentation or omission regarding the China licensing deal that he believed was to be part of the overall agreement.  See MicroStrategy, Inc. v. Acacia Research Corp., 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010); see also Carrow, 2006 WL 3289582 at *11 (fraudulent inducement unavailable as a defense where plaintiff had opportunity and motive to raise issues of inconsistencies with prior oral representations prior to signing but did not).  Further, prior oral promises generally do not constitute false representations of fact that would satisfy the first element of fraudulent misrepresentation.  Carrow, 2006 WL 3289582 at *8.  According to Carrow:

[t]he problem with allowing a party to use promises and statements of intention to

12

invoke the fraud exception to the parol evidence rule is that the very point of the rule is to exclude such things. Parties exchange various representations and supposed offers during negotiations, and reasonable misunderstandings can, and do, occur. By putting their understandings into a written contract, the parties highlight the points on which they have reached agreement and in some cases, the points on which they still diverge. The presumption embodied in the parol evidence rule is that the final written contract reflects the positions and compromises upon which the parties finally reached agreement. If the only showing required to invoke the fraud exception to the parol evidence rule were inconsistent prior oral statements, such oral statements would often (usually) be admitted, and the exception would swallow the rule.

Id. Cubic argues that all of the collateral promises that Mr. Wang relies on for his fraudulent inducement defense are alleged future promises (i.e., promises to give him licenses to manufacture and market goods and services in China) rather than misstatements of present facts.

Mr. Wang does not dispute that he is relying on prior oral promises of a future licensing deal in China, but instead argues that this case falls within the exception articulated in Carrow whereby evidence of future promises can be considered if, for example, a promisor makes "an oral promise knowing that, either because of exigencies of time or circumstance, the promisee will not notice or understand if the promise is omitted or changed in the final written agreement, or perhaps that other terms that should have been excluded were, nonetheless, included." Carrow, 2006 WL 3289582 at *8. Mr. Wang argues that that Peregrine "hounded" him to close the deal, he signed the Note at a crowded restaurant without his attorney present where he had little time to read the document and forgot his glasses, Mr. Hendrick's communications were peppered with promises to give Mr. Wang the right to market and sell Peregrine and NeoVista products in China, and there was an implicit relationship between Peregrine and NeoVista due to Mr. Hendrick's emails being sent from a "neovistainc.com" email account. He argues that these facts create a material dispute as to fraudulent inducement, and a reasonable jury could find that Mr. Hendrick purposely and improperly "muddied the waters" to induce Mr. Wang to invest and that Mr. Wang reasonably believed that he was investing in Peregrine and would get rights to NeoVista as well. Mr. Wang also argues that even though he was told that the Peregrine and Neovista deals were separate, it was reasonable for him to believe they were two related deals and his signature on the Note was the first of many signatures to come on additional agreements.

Mr. Wang's points are not well-taken. There are lengthy email chains among Mr. Wang,

his counsel and representatives of Peregrine discussing the potential deal over the course of almost two weeks.  Mr. Wang had ample opportunity to review the written agreement and determine whether the agreed-upon terms were contained therein.   To the extent that Mr. Wang claims that he did not have time to review the Note prior to signing because it was presented to him at a restaurant, he could have refused to sign it during the dinner and taken time to review it or provide it to his attorney for a final review, but instead he admittedly signed it without reading it closely and without the benefit of his glasses.  Indeed, this is just the sort of inadequate parol evidence that, if allowed to defeat contract claims, would swallow the rule, as Carrow pointed out.  There is no evidence that Mr. Wang lacked a full opportunity to review the contract and discover any alleged misrepresentation or omission in its terms prior to signing.

Likewise, there is no evidence that earlier drafts of the documents contained reference to a license agreement for Peregrine or NeoVista products or other terms that were secretly removed from the final version, or that Mr. Wang was told that any such terms would be in the final written agreement and was then prevented from confirming this for himself.  To the contrary, when Mr. Wang indicated his belief that a license to manufacture and market Peregrine and NeoVista products was a part of the overall deal, but both Peregrine and Mr. Wang's own counsel specifically explained to Mr. Wang that the Note was separate from any licensing agreements prior to him signing the Note.  See Wang Depo. Ex. 9 (PW000021, PW000027), Ex. 10.  Mr. Wang was informed prior to signing the Note that Peregrine was a separate entity from NeoVista, and his own email reflects an understanding of the distinction between the entities.  Id. at PW000027; see also Wang Depo. at 83.  Therefore, to the extent that he is attempting to rely on a theory of fraudulent inducement relating to an alleged understanding that a licensing deal with NeoVista in China was to be part of the written agreement, there is no evidence to support this theory and it fails as a matter of law.

### 2. General Information Regarding Company's Financial Condition

Mr. Wang also argues that Peregrine materially misrepresented or omitted the truth of its financial condition during negotiations.  He cites In Re Nine Systems Corp. Shareholders Litig., 2013 WL 4013306, at *2 (Del. Ch. July 31, 2013), where the court held that allegations that a

United States District Court
Northern District of California

company failed to disclose a potential merger when asked by investors for an update on the company's activities and business prospects was sufficient to state a claim for fraud by active concealment.  Mr. Wang claims that he intended to request information about Peregrine's business prospects when he asked for copies of Peregrine's agreement with HP, other agreements, and information regarding outstanding stock and funds committed.  See Wang Decl. ¶ 12, Ex. 1 (PW000025-26).  According to Mr. Wang, Mr. Hendrick and Mr. Foster "surely knew that Mr. Wang sought information about the company's viability" because of his difficulty with the English language, even though he only asked for specific agreements.  Opp. at 14-15.  Mr. Wang argues that Peregrine should have voluntarily provided him with the earlier Investor Updates issued several months before he met Mr. Hendrick, and that no one ever told him about Peregrine's precarious financial condition.  However, Mr. Wang unequivocally testified that he never asked anyone at Peregrine about the company's financial condition.  Wang Depo. at 22, 30.  Mr. Wang cites no law creating a duty on the part of Peregrine to voluntarily disclose all of its financial information when he only asked about three specific agreements.

### 3.    Statement Regarding Investor Funding Commitment

On the record before this Court, the only potentially false or misleading statement regarding Peregrine's present financial condition made to Mr. Wang prior to him signing the Note that could support a theory of fraudulent inducement is contained in an October 4, 2011 email chain.  The email chain contains a discussion of various deal points among Mr. Wang and his attorney as well as Mr. Hendrick and Mr. Foster of Peregrine.  In response to a question from Mr. Wang's counsel about the requirement that Mr. Wang pledge his Peregrine shares to Qualcomm, Peregrine stated:

> Peregrine obviously does not want Qualcomm to take the shares of any investor.
> Peregrine plans on getting a bank loan to replace all or part of the Qualcomm
> loan, in which case Qualcomm would be asked to convert its loan to stock.
> Peregrine investors have also committed to funding or obtaining the remainder of
> the equity requirements so that Qualcomm will not have a reason to seize the
> stock.  Once Closing occurs, Peregrine will have a clean balance sheet and during
> October will have over $80,000 in revenue from HP and other customers.
> Therefore, the company will be likely to obtain bank financing.

Wang Depo. Ex. 9 at PW000022.  Mr. Wang's attorney commented on this paragraph, "This is far

1    from certain Peter."  Id.

2                        **a.       False or misleading statement**

3            Mr. Wang focuses heavily on the statement:  "Peregrine investors have also committed to

4    funding or obtaining the remainder of the equity requirements so that Qualcomm will not have a

5    reason to seize the stock."  Id.  According to Mr. Wang, Mr. Hendrick repeated the same thing to

6    him orally.  Wang Depo. at 122-23.  However, on October 9, 2011, Peregrine issued an Investor

7    Update that stated: "As reported earlier, we need to fund $500K, reduced from the previous

8    $550K, by October 15 to maintain our ownership under the Qualcomm contract . . . As of today,

9    the Board has firm commitments or actual funds from Investors for about $75,000 of the $500K.

10   The Board is confident that other investors will follow through to fund the remaining requirements

11   . . ."  Peterson Decl. Ex. 5 (CUBIC000977).

12           According to Mr. Wang, the statement in the October 4, 2011 email regarding investor

13   funding commitments was a material misrepresentation that fraudulently induced him to enter into

14   the agreement because four days later Peregrine was asking its investors for money it had recently

15   told Mr. Wang that investors had already committed to funding or obtaining, and he was never

16   informed that investors had not committed actual cash to satisfy Qualcomm at the time he signed

17   the Note.  Mr. Wang argues that Mr. Hendrick and Mr. Foster assumed a duty to update their

18   statements regarding the status of investor funding to satisfy the Qualcomm obligation when

19   subsequent events rendered the representation materially misleading.  He states that he would not

20   have signed the Note if he had known that Peregrine investors had not yet committed funds to

21   satisfy the Qualcomm loan terms.  Wang Decl. ¶ 27.

22           Cubic contends that the statement in question, when read in its complete context, was not

23   actually false or misleading.  Specifically, Cubic argues that as of October 4, 2011 when the email

24   was sent, the financing arrangement with Qualcomm had not closed.  See Wang Decl. Ex. 1

25   (PW000025) (10/2/15 email from Mr. Hendrick to Mr. Wang stating, "As soon as we close the

26   Qualcomm agreement we will start the process with Silicon Valley Bank.").  However, Qualcomm

27   had previously offered an initial loan of $1.8 million, $1 million of which would be provided at

28   closing once Peregrine investors raised $375,000 in equity investments so that Peregrine would

United States District Court
Northern District of California

have a clean balance sheet.  <u>See</u> Peterson Decl. Ex. 4 (9/26/11 Investor Update).  The Qualcomm deal closed on October 6, 2011, and thus according to Plaintiffs it had necessarily obtained the required $375,000 in equity investment at some point prior to this, so its statement on October 4 was not false.  <u>Id</u>. Ex. 5 (10/9/11 Investor Update informing investors that it had raised $1.4 million in new funds, closed the Qualcomm deal and obtained $1 million loan from Qualcomm); Wang Decl. Ex. 7 (11/7/11 Investor Update).

Peregrine acknowledged that it still needed $500,000 by October 15 to maintain ownership and obtain an additional $800,000 loan from Qualcomm, and Plaintiff claims that it was in that context that it stated that the Board "has firm commitments or actual funds from Investors for about $75,000 of the $500K." <u>Id</u>.  Further, the October 9 Investor Update stated that Peregrine also needed to raise an additional $1.2 million by November 30 to obtain an additional $200,000 from Qualcomm.  Peterson Decl. Ex. 5.  Plaintiff's position is that the Qualcomm deal was structured so that funding would come in increments following a certain amount of investor equity commitment, and its statement on October 4 was specific to the first Qualcomm payout/investor equity commitment requirement -- even though it was not expressly limited to the first payout -- so it was true when made and did not become false prior to Mr. Wang signing the Note.

The question is whether it was reasonable for Mr. Wang to interpret the statement in the October 4 email to mean that investors had committed to funding or obtaining <u>all</u> of the funds necessary to satisfy the entire Qualcomm obligation, or whether such an interpretation is unreasonable as a matter of law.  Notably, in the same October 4, 2011 email, Peregrine elsewhere stated: "No, Qualcomm hasn't yet loaned any money to Peregrine.  The first loan from Qualcomm will be drawn down at Closing in the next couple of days.  After that, Qualcomm will loan another $1 million in two steps in October and in November <u>when Peregrine investors commit another $2.1 million in equity</u>."  <u>See</u>  Wang Depo. Ex. 9 at PW000021 (emphasis added).  Arguably, if he read the entire email, Mr. Wang should have been aware of the fact that not all of the money from Qualcomm would be coming in at once, and some of it was contingent on additional fundraising. However, the statement he relies on is not so limited, so drawing all inferences in his favor, his interpretation is not necessarily unreasonable.

United States District Court
Northern District of California

Cubic also points out that by October 15, Peregrine investors had raised an additional $500,000 in equity investment, which led to the release of an additional $800,000 from Qualcomm. Wang Decl. Ex. 6 (11/20/15 Investor Update). Thus, according to Cubic, the statement was still true as of this date. According to Cubic, Peregrine reasonably believed that upon raising $500,000 in equity investments and $800,000 from Qualcomm it would be able to obtain a bank loan. See Peterson Decl. Ex. 6 (10/12/11 Investor Update). Cubic argues that it had no reason to believe it would not obtain a loan prior to Mr. Wang signing the Note, so there was nothing for it to "update" and its Investor Updates from this timeframe are consistent with its belief that it would obtain funding. See Wang Decl. Ex. 7.

Though Cubic's arguments are strong, viewing the evidence in the light most favorable to Mr. Wang, the Court cannot conclude that no reasonable jury could find that Mr. Wang reasonably interpreted the statement in the email that investors had "committed to funding or obtaining the remainder of the equity requirements so that Qualcomm will not have a reason to seize the stock" to mean the entire amount required by Qualcomm, not just the first incremental amount. Under that interpretation, the statement was at least misleading and needed correction before Mr. Wang signed the Note.

**b.        Reasonable reliance and intent**

To show that Mr. Wang's reliance on this single statement, even if false or misleading, was unreasonable, Cubic relies on a cautionary statement from Mr. Wang's counsel to Mr. Wang in the same October 4, 2011 email chain. Specifically, following the paragraph (quoted above) containing the statement that "Peregrine investors have also committed to funding or obtaining the remainder of the equity requirements so that Qualcomm will not have a reason to seize the stock," Mr. Wang's attorney responded, "This is far from certain Peter." Wang Depo. Ex. 9 at PW000022. Cubic argues that Mr. Wang's attorney's cautionary statement made it unreasonable for Mr. Wang to rely on Peregrine's statement to his detriment. However, looked at in the light most favorable to Plaintiff, arguably the attorney's cautionary statement could be seen as relating to whether or not Peregrine would eventually obtain bank financing, rather than the current status of Peregrine's investor financing commitments to satisfy the Qualcomm obligation.

As noted above, the same October 4, 2011 email relied on by both sides also contains a statement by Peregrine in response to a comment from Mr. Wang's attorney about the Qualcomm loan that: "No, Qualcomm hasn't yet loaned any money to Peregrine.  The first loan from Qualcomm will be drawn down at Closing in the next couple of days.   After that, Qualcomm will loan another $1M in two steps in October and November <u>when Peregrine investors commit another $2.1M in equity</u>.  During 2012 Qualcomm may, but does not have to, loan another $1M if the business needs it."  <u>Id</u>. (PW000021) (emphasis added).  Also in the same email, Mr. Wang was informed by his own counsel that he was obligated under the Note regardless of what happened with Peregrine's future success.  <u>See</u> Wang Depo. Ex. 9 at PW000021 (note from Mr. Wang's counsel to Mr. Wang in email chain: "Peter, this is a key deal point – understand that you are obligated to pay for these shares regardless of whether you sell your marina interest and regardless of how well the company does after you sign.").  Therefore, even within the very same email, Mr. Wang was informed that more investor funding was needed to secure additional loan money from Qualcomm and that he would be obligated on the Note regardless of what happened to Peregrine going forward.[1]  These statements significantly diminish the reasonableness of Mr. Wang's reliance, especially in light of the fact that he did not ask for any general financial information about the company.

However, the question is whether a reasonable jury could conclude, based on this record, that Peregrine intended for its statement about investors having committed to funding or obtaining funds to satisfy the Qualcomm obligation to induce Mr. Wang to enter into the agreement, and that Mr. Wang reasonably relied on the statement and it caused him to enter into the agreement.  Mr. Wang relies on <u>In Re Wayport, Inc., Litig</u>., 76 A.3d 296 (Del. Ch. 2013), a fraudulent inducement case in which a corporate representative told an investor that he was not aware of any "bluebirds

---

[1] Cubic also argues that language in the Stock Purchase Agreement affirming that Mr. Wang was "aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the securities" directly contradicts his position that he was unaware of Peregrine's financial condition. <u>See</u> Dressel Decl. Ex. 3.  However, this affirmation in the contract is meaningless if Peregrine was deceptive as to its financial condition, or became deceptive by omission following a material change as to its financial condition.

of happiness" in the company's world, and the court held that the decision to make this statement created a duty to update the statement when it became materially misleading a month later when the company received unexpected good news about a potential sale of the company. Id. at 324. Further, the court found an intent to induce action because the "bluebirds of happiness" statement was intended to mollify the investor and convince him to sell his shares, and the investor's reliance was justified because the corporate representative was knowledgeable about the corporate affairs. Id. at 325. Causation was deemed present because the statement caused the investor to sell his shares, and he would not have done so absent the statement. Id. at 325-26. Finally, the court found scienter based on circumstantial evidence that corporate representatives knew that disclosure of information about the company sale would put the investor's stock sale at risk and therefore decided not to correct the earlier representation. Id. at 326-27.

Wayport is distinguishable from this case in that there was significant evidence of corporate intent to hide the fact of the upcoming corporate sale in order to induce the investor to act as well as evidence of reasonable reliance, whereas here it is unclear whether or at what point the statement about investors' funding commitments became untrue or whether Peregrine actually intended to or did induce reliance on the statement, and whether scienter is satisfied. It is a close question whether Mr. Wang's very limited, somewhat equivocal and contradictory evidence contained in a single email is sufficient to defeat summary judgment. However, the Court must view the evidence in the light most favorable to Mr. Wang on summary judgment, and concludes that Mr. Wang's fraudulent inducement defense based on this single statement in the October 4 email is sufficient to preclude summary judgment provided he read and relied on the email.

### i. Did Mr. Wang Read the Email In Question?

During oral argument, the parties disputed whether there was evidence that would prove or disprove whether Mr. Wang actually read the October 4, 2011 email in question, and thus whether he could possibly establish reasonable reliance to prove fraudulent inducement. The Court allowed both sides to provide it with supplemental citations to evidence supporting their position following the hearing. Both sides submitted deposition testimony excerpts, as well as additional briefing on the issue. Mr. Wang's testimony about whether or not he read the October 4, 2011

20

email is unclear:

- He does not recall reviewing comments he received from his attorney that he then forwarded to Mr. Hendrick on October 4, 2011.   Wang Depo. at 102-03.

- He stated, "I don't recall this email." regarding the October 4, 2011 email containing his attorney comments.  Wang Depo. at 107.

- When questioned about comments on the October 4 email prior to signing the Note, he stated, "Yeah but I did not read this."  Wang Depo. at 120.

Thus, Mr. Wang's testimony is focused on whether he read his attorney's comments, not necessarily the underlying email from Peregrine, and neither side points to any direct evidence of whether or not he read the underlying email containing the statement in question.  Mr. Wang contends that other evidence shows that he read the email, specifically the fact that he forwarded his attorney's comments to Mr. Hendrick and Mr. Foster three hours after receiving the comments and asked Mr. Hendrick to call him.  However, this does not establish that he read the underlying email.  Further, Mr. Wang contends that he testified about reading other emails (Wang Depo. at 96) and this shows he was active and informed in the negotiation process.  However, the fact that Mr. Wang specifically recalls reading a different email on another day, but testified that he did not read his attorney comments on the email in question, does not establish that he read the October 4 email, and could indicate that he did not read it.

Mr. Wang also argues that there is insufficient evidence to establish beyond dispute that he did not read the email.  However, this is Cubic's Motion for Summary Judgment on its breach of contract claim, and the issue of fraudulent inducement is Mr. Wang's defense.  Because the non-moving party, Mr. Wang, will bear the burden of proof at trial on the issue of whether he read and reasonably relied on the email containing the statement in question, Plaintiff can prevail by pointing out an absence of evidence to support Mr. Wang's position, and Mr. Wang must set forth specific facts showing a genuine issue for trial or else Cubic is entitled to judgment as a matter of law.  This presents a close question.

**ii.     Separate oral representation**

However, Mr. Wang also argues that even if he did not read the email in question, Mr. Hendrick made the same representation regarding investor funding commitments to satisfy the

21

Qualcomm obligation orally.  Cubic counters that Mr. Wang is misrepresenting his own deposition testimony and he never testified that Mr. Hendrick told him that the investors had raised enough equity to satisfy Qualcomm, and their discussions were more focused on obtaining bank financing. The substance of Mr. Wang's testimony on this topic is as follows:

- Though the October 4, 2011 email stated that Qualcomm had not yet loaned any money to Peregrine, Mr. Wang stated "I'm not so sure that's the truth" because he "had the impression that Qualcomm are being made the commitment but not loan to – from Qualcomm to Peregrine.  Just commitment, not actually physically made the loan to them." Wang Depo. at 108.

- When questioned whether someone explained to him or whether he was aware of the fact that the first loan from Qualcomm would be drawn down at closing and another $1 million would come in two steps in October and November when investors committed another $2.1 million, he responded "No." Wang Depo. at 108-09.

- He also responded "No" to the next question about whether he recalled reading the October 4 email.  Wang Depo. at 108-09.

- He did not have an understanding prior to signing the note that investors needed to come up with another $2.1 million before Qualcomm would have to loan additional money in November and thinks the statement in the email could be incorrect because it is "different from what John Hendrick told" him and he "had impression from John Hendrick that Qualcomm made the commitment somewhere about $1.2 million . . ." Wang Depo. at 109-110.

- He stated that he "believe somewhere John Hendrick mentioned that there is some – all the shareholders of Peregrine should make more investment and have unanimous [] vote and pledge the shares."  Wang Depo. at 110.

- When he was read the portion of the email in question during his deposition, including the part about "Investors committed to funding or obtaining the remainder of the equity requirement," Mr. Wang stated, "Yeah. That what he [Mr. Hendrick] told me about this." Wang Depo. at 122-23.

Mr. Wang's testimony is far from clear, but his statement that Mr. Hendrick told him that investors had committed to funding or obtaining the remainder of the equity requirement is relatively unequivocal.  Therefore, even if Mr. Wang did not read the October 4 email containing the statement, there is some evidence that Mr. Hendrick told him the same information orally and arguably he could have relied on that statement to his detriment by signing the Note.[2]  On this record the Court cannot grant summary judgment in Cubic's favor and the motion is DENIED.

_____

[2] Cubic also notes that in his responses to Interrogatories, Mr. Wang did not claim that he was induced to sign the Note as a result of any statements by Peregrine relating to investor funding or the Qualcomm transaction.  See Dkt. No. 33-2 at 45.  While true, interrogatory responses are non-binding and while potentially useful for impeachment in a trial, appear to be insufficient to

United States District Court
Northern District of California

1

2          **IT IS SO ORDERED.**

3     Dated:  August 20, 2015

4

5                                        
                                         ELIZABETH D. LAPORTE
6                                        United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     _____

26     grant summary judgment in Plaintiff's favor.  See Victory Carriers Inc. v. Stockton Stevedoring
       Co., 388 F.2d 955, 959 (9th Cir.1968) (holding that answers to interrogatories not given the same
27     binding effect conferred on responses to requests for admission); Donovan v. Crisotomo, 689 F.2d
       869, 875 (9th Cir.1982) (stating that "[i]nterrogatories do not supersede or supplement pleadings,
28     nor do they bind parties as an allegation or admission in a pleading or pre-trial order").

                                        23

United States District Court
Northern District of California